IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL C. WORSHAM,

 *Plaintiff*,

 v.

U.S. DEPARTMENT OF THE
TREASURY,

 *Defendant*.

Civil Action No. ELH-12-2635

**MEMORANDUM OPINION**

 Michael C. Worsham, plaintiff,[1] filed suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking to compel the United States Department of the Treasury (the "Treasury"), defendant, and the Internal Revenue Service ("IRS"), which is a bureau of the Treasury, to disclose and release certain agency records, and seeking declaratory and other relief.   In his Amended Complaint (ECF 14), which is the operative pleading, plaintiff asserts four counts.[2]

 Count 1 arises under the FOIA, and seeks the release of certain information regarding a document published on the IRS's website entitled "The Truth About Frivolous Tax Arguments." Count 2, which also arises in part under the FOIA, seeks the release of information regarding backup withholding that the IRS directed Worsham's financial institution to impose against

---

[1] Plaintiff is an attorney licensed to practice law in Maryland and a member of the bar of this court.  He is self-represented in this case.

[2] Worsham's original Complaint (ECF 1), filed on September 4, 2012, only asserted a single count, which arose under the FOIA.  The Amended Complaint was filed on November 15, 2012, before the Treasury had responded to the original Complaint.  Hereafter, references to Worsham's "complaint" refer to his Amended Complaint, unless otherwise noted.

Worsham beginning in March 2009, and asserts that the backup withholding against Worsham is unlawful.[3]   Count 3 asserts that three forms published by the IRS (Form 1040, Form W-9, and Form 4564) do not comply with the PRA, and seeks, *inter alia*, a declaration that Worsham cannot be penalized for failing to file those forms unless the IRS brings them into compliance with the PRA.   Count 4 seeks a declaration that the federal income tax is unconstitutional as administered because it is a non-apportioned direct tax.

After suit was filed, Worsham filed a "Petition[ ] to Quash Two IRS Summons" ("Petition to Quash") (ECF 28), which does not pertain directly to any of the causes of action he asserted in his complaint.   Rather, the Petition to Quash arises under 26 U.S.C. § 7609(b)(2)(A), and seeks to quash administrative summonses issued by the IRS to two banking institutions with which Worsham holds accounts, seeking examination, pursuant to 26 U.S.C. § 7602(a)(2), of banking records concerning Worsham for certain specified time periods.[4]

---

[3] When a payor makes a "reportable payment" to a payee (*i.e.*, a payment that must be reported to the IRS, as specified in 26 U.S.C. § 3406(b)), and other conditions apply, such as if the payee failed to furnish a valid taxpayer identification number (TIN) to the payor, or if the IRS has notified the payor that the payee has underreported the payee's tax liability, 26 U.S.C. § 3406(a) requires the payor to undertake a process known as "backup withholding."   "The essence of backup withholding is that the payor pays the payee, but withholds a certain amount of money and remits that money to the IRS, creating a backstop to ensure that the payee will pay taxes on the money received."   *Childers v. Receivables Perf. Mgmt. LLC*, No. C13-0697JLR, 2013 WL 1944511, at *1 (W.D. Wash. May 9, 2013).

[4] Section 7609(b)(2)(A) authorizes any person who is entitled to notice of an IRS summons issued pursuant to § 7602(a)(2) (among other statutes authorizing the IRS to issue summonses) to "begin a proceeding to quash such summons" in the "United States district court for the district within which the person to be summoned resides or is found."   *Id.* § 7609(h)(1). Such a "proceeding" should have been initiated as a separate civil action, rather than by motion in an already pending and unrelated case.   However, I will not further explore this point because, although the Treasury made the same observation, it stated that, "in the interests of judicial

Six motions are currently pending.  Worsham has filed a "Motion for Partial Summary Judgment for Count 3 Under the Paperwork Reduction Act") ("PRA Motion") (ECF 16) and a "Motion to Produce Documents Responsive to FOIA Claims" ("FOIA Production Motion") (ECF 41).  The Treasury has filed a partial motion to dismiss, seeking dismissal of Counts 3 and 4 for lack of subject matter jurisdiction and dismissal of Counts 1 and 2, in part, for failure to state a claim upon which relief can be granted ("Motion to Dismiss") (ECF 19 & 20). Subsequently, the Treasury filed a partial motion for summary judgment as to Counts 1 and 2 ("FOIA MSJ") (ECF 42 & 43), and Worsham filed a cross-motion for summary judgment as to those counts ("FOIA Cross-MSJ") (ECF 46).  Finally, the Treasury has filed a motion to deny the Petition to Quash and for summary enforcement of the summonses to Worsham's financial institutions ("Quash Motion") (ECF 31 & 32).

The motions have been fully briefed,[5] and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Treasury's Motion to Dismiss as

---

economy," it would not argue the point as a basis for denial of the Petition to Quash and, instead, would "address the petition to quash" on the merits. ECF 32 at 1 n.1.

Pursuant to 26 U.S.C. § 7609(d)(2), the filing of a timely petition to quash under § 7609(b)(2) automatically bars the "examination of any records required to be produced under [the] summons" at issue, "except in accordance with an order of the court having jurisdiction of such proceeding or with the consent of the person beginning the proceeding to quash."

[5] In connection with Worsham's PRA Motion and the Treasury's Motion to Dismiss, I have considered the motions and their supporting memoranda; Worsham's opposition to the Motion to Dismiss ("Dismiss Opp.") (ECF 26); the Treasury's consolidated opposition to the PRA Motion and reply in support of the Motion to Dismiss ("PRA Motion Opp.") (ECF 30); and Worsham's reply in support of the PRA Motion ("PRA Motion Reply") (ECF 37).

With respect to Worsham's FOIA Production Motion, as well as the FOIA MSJ (which includes the Treasury's opposition to the FOIA Production Motion) and Worsham's FOIA Cross-MSJ (which includes his opposition to the FOIA MSJ), I have considered the motions and their supporting memoranda; the Treasury's combined reply in support of the FOIA MSJ and

to Counts 3 and 4; deny, as moot, Worsham's PRA Motion; deny, as moot, Worsham's FOIA Production Motion; grant in part and deny in part the Petition to Quash and the Quash Motion; and grant the FOIA MSJ in part and deny the FOIA Cross-MSJ in part, and otherwise hold those motions sub curia. In particular, I will grant the FOIA MSJ and deny the FOIA Cross-MSJ with respect to the FOIA claims in Count 2, and I will dismiss the non-FOIA claims in Count 2 for lack of subject matter jurisdiction; with respect to Count 1, I will hold the FOIA MSJ and FOIA Cross-MSJ sub curia, pending further submissions.[6]

## I. Subject Matter Jurisdiction: Counts 3 and 4

As noted, the Treasury challenges the Court's subject matter jurisdiction regarding Count 3 (the PRA claim) and Count 4 (the challenge to the constitutionality of the federal income tax). Because "a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits," *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 187 (4th Cir. 2013), the jurisdictional issue is necessarily antecedent to any consideration of the merits. However, to put the jurisdictional issues in perspective, I begin by providing some detail regarding the nature of the two counts at issue, starting with Count 3.

### A. Paperwork Reduction Act

Enacted in 1980, the "PRA was passed in an effort to reduce the burden that

---

opposition to the FOIA Cross-MSJ ("FOIA MSJ Reply") (ECF 47); and Worsham's reply in support of the FOIA Cross-MSJ ("FOIA Cross-MSJ Reply") (ECF 48).

As to the Petition to Quash and the Quash Motion, I have considered the petition and the motion and their supporting documents; Worsham's opposition to the Quash Motion ("Quash Opposition") (ECF 38); and the Treasury's reply ("Quash Reply") (ECF 39).

[6] As I explain, *infra*, the core legal determination with respect to the FOIA cross-motions as to Count 1 cannot be made on the basis of the *Vaughn* index submitted by the government. Instead, the Court must conduct an in camera review of the documents at issue.

administrative agencies place upon the public by requesting information." *United States v. Gross*, 626 F.3d 289, 295 (6th Cir. 2010) (citing *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990)). To that end, the PRA requires a federal agency that intends to conduct or "sponsor" a "collection of information" to conduct an internal evaluation of the need for the collection of information at issue and the burdens it will impose, *see* 44 U.S.C. §§ 3506(c), 3507(a)(1)(A); to solicit public comment on the proposed collection, *id.* § 3507(a)(1)(B); and to submit its proposed form for collection of information to the Office of Management and Budget ("OMB"), which must review the proposal and, if it approves it, provide a "control number" for the collection, which must be "displayed upon the collection of information," *i.e.*, on the form or other document that is used to collect the information. *Id.* § 3507(a)(2)-(3).

The PRA provides a protection for the public against agency collection of information that does not comply with the statute. It is codified in § 3512:

> (a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if—
>
>> (1) the collection of information does not display a valid control number assigned by the Director [of OMB] in accordance with this subchapter; or
>>
>> (2) the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.
>
> (b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

Worsham contends that IRS Forms 1040, W-9, and 4564 constitute agency "collection[s] of information" under the PRA, but that the IRS has not submitted these forms to OMB for periodic approval as required by the PRA, and either has not obtained OMB control numbers for the forms or has not affixed currently valid control numbers to them. Form 1040 is the "United

States Individual Income Tax Return," readily familiar to virtually every person of working age in the United States.   Form W-9 is the "Request for Taxpayer Identification Number and Certification," another ubiquitous IRS form, which is used by payors who must report payments to the IRS in order to acquire from their payees information regarding each payee's identity and TIN.   Form 4564 is likely less familiar to the average taxpayer.   It is the form for an "Information Document Request," which may be issued by the IRS to a taxpayer to request the production of documents specified by the requesting IRS agent.

In his amended complaint, Worsham claims that, within a week after service of his original complaint on the government, an IRS agent sent him an IRS Form 4564 seeking production of "25 different categories of documents."   Amended Complaint ¶ 22.   Worsham alleges that he should not be required to respond to the Form 4654 request, *id.* ¶ 35, nor should he be required to complete and provide a Form 1040 unless and until the forms are brought into compliance with the PRA.   With respect to Form W-9, Worsham alleges that, "[a]s an attorney handling settlements," he is often requested (or his clients are requested) to "complete a Form W-9 as a condition of completing and paying a settlement."   *Id.* ¶ 57.   He claims that neither he nor his clients should be required to complete Form W-9s until the form is brought into compliance with the PRA.

As relief with respect to Count 3, Worsham seeks an order making four declaratory rulings, as follows, *id.* at 8-9:

3A.     … declaring the Defendant's actions to be a violation of the PRA;

3B.     … declaring that Forms 4564, 1040 and W-9 do not comply with the PRA;

3C.     … declaring that for Forms 4564, 1040 and W-9 the IRS must apply every 3 years for a valid OMB Control number or for an extension of a current number;

3D.    … declaring that Worsham should not have to respond to, and can not be penalized for failing to respond to or use, Forms 4564, 1040 and/or W-9 unless and until the Forms and IRS fully complies with all of the PRA, including but not limited to, obtaining and maintaining a currently valid OMB Control Number.

### B.  Constitutionality of the Federal Income Tax

Count 4 asserts a constitutional challenge to the federal income tax.  The United States Constitution, Article I, § 8 grants Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises," and the "Uniformity Clause" of that section provides that "all Duties, Imposts and Excises shall be uniform throughout the United States."  "Imposts," "Duties," and "Excises," in the sense discussed in the Uniformity Clause, are all varieties of so-called "indirect" taxes, in contrast to "direct taxes," which are discussed in Sections 2 and 3 of Article I.  *See, e.g.*, *United States v. West Virginia*, 339 F.3d 212, 215 (4th Cir. 2003) ("'The Uniformity Clause [governing duties, imposts, and excises] conditions Congress' power to impose indirect taxes.'") (Citations omitted) (alteration in original).

Article I, § 2, Cl. 3 of the Constitution provides that "direct Taxes shall be apportioned among the several States" according to population as determined by the decennial census.  And, Article I, § 9, Cl. 4 states: "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census . . . ."  Taken together, these provisions require "that any 'direct Tax' must be apportioned so that each State pays in proportion to its population."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, ___ U.S. ___, 132 S. Ct. 2566, 2598 (2012) ("*NFIB*") (opinion of Roberts, C.J., speaking for the Court in Section III-C of his opinion).

Thus, as the Supreme Court explained in the watershed case of *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 617-18 (1895), "the constitution divided federal taxation into

two great classes,—the class of direct taxes, and the class of duties, imposts, and excises,—and prescribed two rules which qualified the grant of power as to each class." The Court added, *id.* at 618: "[T]o lay direct taxes without apportionment was forbidden. The power to lay duties, imposts, and excises was subject to the qualification that the imposition must be uniform throughout the United States." In other words, Congress "must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity." *The License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1866).

What qualifies as a "direct tax" has been a subject of debate. As Chief Justice Roberts recently observed in *NFIB*, a "narrow view of what a direct tax might be persisted for a century" after the Constitution was ratified. *NFIB*, 132 S. Ct. at 2598. Under that narrow understanding, "only two forms of taxation were direct: capitations," *i.e.*, per-person taxes, "also known as a 'head tax' or a 'poll tax'"; and "land taxes," *i.e.*, "'taxes on real estate.'" *Id.* (citations omitted). However, in its 1895 decision in *Pollock*, the Court "expanded [its] interpretation" of direct taxes "to include taxes on personal property and income from personal property, in the course of striking down aspects of the federal income tax." *Id.*

The Supreme Court held in *Pollock* that a tax on personal property and on rent or other income derived from real or personal property, as imposed by the Income Tax Act of 1894, was a direct tax that was non-apportioned and thus violated the constitutional requirement that "direct taxes shall be apportioned among the several states according to numbers, and negatively that no direct tax shall be laid unless in proportion to the enumeration." *Pollock*, 158 U.S. at 621. The *Pollock* Court reasoned that it would be an "evasion" of the prohibition on non-apportioned direct taxes to hold that "a general unapportioned tax, imposed upon all property owners as a

body for or in respect of their property, is not direct, in the meaning of the constitution, because confined to the income therefrom." *Id.* at 627. The Court found it "impossible to hold" that the apportionment requirement could "be refined away by forced distinctions between that which gives value to property and the property itself." *Id.* at 628. Therefore, the *Pollock* Court held that "taxes on real estate being indisputably direct taxes, taxes on the rents or income of real estate are equally direct taxes," and "that taxes on personal property, or on the income of personal property, are likewise direct taxes." *Id.* at 637.

The Sixteenth Amendment, ratified in 1913, overturned *Pollock*. *See NFIB*, 132 S. Ct. at 2598 (stating that *Pollock*'s "result was overturned by the Sixteenth Amendment"). The Sixteenth Amendment provides, in total: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

The precise import of Worsham's claim in Count 4 of his complaint is not easy to discern, but its linchpin seems to be that, although the Sixteenth Amendment authorizes non-apportioned "taxes on incomes, from whatever source derived," it does not explicitly authorize a non-apportioned direct tax, because the phrase "direct tax" is not contained in the amendment. Thus, Worsham argues that the effect of the Sixteenth Amendment was to abrogate *Pollock*'s mode of analysis, *i.e.*, the reasoning that, because a property tax was a direct tax, a tax on income derived from property was also a direct tax. As Worsham puts it, the Sixteenth Amendment negated *Pollock*'s "logic . . . that the source of the income determines whether it is a direct or indirect tax." Dismiss Opp. at 14. In support of this claim, he cites the following passage from *Stanton v. Baltic Mining Co.*, 240 U.S. 103, 112-13 (1916) (emphasis added):

[T]he provisions of the 16th Amendment conferred no new power of taxation, but simply prohibited the previous complete and plenary power of income taxation possessed by Congress from the beginning *from being taken out of the category of indirect taxation to which it inherently belonged*, and being placed in the category of direct taxation subject to apportionment *by a consideration of the sources from which the income was derived*,—that is, by testing the tax not by what it was, a tax on income, but by a mistaken theory deduced from the origin or source of the income taxed.

Worsham seems to reason that the Sixteenth Amendment provides that the source from which income is derived is not determinative of whether a tax on that income is direct or indirect. But, he claims that the Sixteenth Amendment did not create for "income taxes" a new exception from the requirement that all direct taxes must be apportioned (or, for that matter, from the requirement that all indirect taxes must be uniform).   Thus, if a so-called "income tax" is "administered" as a non-apportioned direct tax, Dismiss Opp. at 17, which he claims a tax "on a person's labor" constitutes, *id.* at 14, such a tax is unconstitutional in his view, notwithstanding the Sixteenth Amendment.   Moreover, Worsham claims that the federal circuit courts of appeal are split as to whether, in fact, the federal income tax as now administered is direct or indirect. *See id.* at 15-17 (citing and discussing cases).

In his complaint, Worsham asserts that the Treasury and the IRS "administer the federal income tax as a direct tax that is neither apportioned nor uniform."   Amended Complaint ¶ 62. He also alleges: "There is legal uncertainty whether the federal income tax as administered by the IRS in the Fourth Circuit, including Maryland, can be administered as a non-apportioned direct tax, or alternatively, as an indirect tax without uniformity."   *Id.* ¶ 65.   Thus, he seeks two declaratory rulings from the Court, *id.* at 9:

> 4A.     … an order declaring the federal income tax as administered by the IRS is
>          a direct non-apportioned income tax.

4B.      … an order declaring that a direct non-apportioned income tax is not
consistent with the U.S. Supreme Court and Fourth Circuit holdings
declaring the type of income tax that may be constitutionally collected.

## C.  Discussion

The Treasury asserts that this Court is barred from reaching the merits of Worsham's

claims in Count 3 and Count 4.  As I will explain, I agree.[7]

As a first salvo, the Treasury observes that, "absent a waiver, sovereign immunity shields

the [federal] Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

According to the Treasury, it is entitled to sovereign immunity because plaintiff has identified no

waiver of sovereign immunity under which he is proceeding and none is applicable.

Even if sovereign immunity does not apply, the Treasury asserts that Count 3 and Count

4 are barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a), which provides that, with

exceptions not applicable here, "no suit for the purpose of restraining the assessment or

collection of any tax shall be maintained in any court by any person, whether or not such person

is the person against whom such tax was assessed."  The Anti-Injunction Act "protects the

Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or

otherwise obstruct the collection of taxes."  *NFIB*, *supra*, 132 S. Ct. at 2582 (opinion of Roberts,

C.J., speaking for the Court in Part II of his opinion).  By otherwise barring suit, the Anti-

Injunction Act channels litigation over tax liability into post-payment suits for refunds.  *Id.*

(citing *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7-8 (1962)); *see also Bob Jones*

*Univ. v. Simon*, 416 U.S. 725, 736 (1974) (stating that, unless a statutory exception to the Anti-

---

[7] In the alternative, the Treasury maintains that Counts 3 and 4 fail to state claims upon
which relief can be granted.  Because I conclude that the Court lacks the authority to adjudicate
the merits of Count 3 and Count 4, I do not reach the Treasury's alternative argument.

Injunction Act applies, "the legal right to the disputed [sums] must be determined in a suit for a refund"). The effect of the Act is "simple and obvious: courts lack jurisdiction to issue injunctive relief in suits seeking to restrain the assessment or collection of taxes." *Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 405 (4th Cir. 2003). Furthermore, it "is clear that the Anti-Injunction Act extends beyond the mere assessment and collection of taxes to embrace other activities . . . that may culminate in the assessment or collection of taxes." *Id.*

Moreover, observing that Count 3 and Count 4 purport to seek declaratory relief, the Treasury points out that the Declaratory Judgment Act expressly carves out from its ambit matters related to taxation. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

> In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes* other than actions brought under [26 U.S.C. § 7428, which authorizes declaratory actions related to the status and classification of certain tax-exempt organizations], . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. (Emphasis added.)

The scope of the "federal tax exception to the Declaratory Judgment Act is at least as broad as the prohibition of the Anti-Injunction Act." *Alexander v. Americans United, Inc.*, 416 U.S. 752, 759 n.10 (1974); *see Cohen v. United States*, 650 F.3d 717, 729 (D.C. Cir. 2011) ("By design, the [Declaratory Judgment Act] tax exception . . . strips courts of jurisdiction to circumvent the [Anti-Injunction Act] by providing declaratory relief in cases 'restraining the assessment or collection of any tax.'"); *id.* at 730 (holding that Declaratory Judgment Act tax carve-out is "coterminous" with Anti-Injunction Act).

In response, Worsham argues that the Declaratory Judgment Act "waives the sovereignty of the U.S. to be sued for actual controversies." Dismiss Opp. at 4. But, case law indicates that

Worsham is mistaken.  The Declaratory Judgment Act "plainly does not operate as an express waiver of sovereign immunity . . . because it 'neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief.'" *Muirhead v. Mecham*, 427 F.3d 14, 17 n.1 (1st Cir. 2005) (citation omitted); *see Goldstein v. Moatz*, 364 F.3d 205, 219 (4th Cir. 2004) ("If a declaratory judgment proceeding actually constitutes a suit against the sovereign, it is barred absent a waiver of sovereign immunity."); *accord Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002).  Even if the Declaratory Judgment Act were to operate as a waiver of sovereign immunity in some cases, it clearly would not do so for claims regarding federal taxes, which are expressly excluded from its ambit.[8]

In an attempt to argue that the Anti-Injunction Act and the Declaratory Judgment Act's carve-out as to tax issues do not apply, Worsham contends that he is not seeking injunctive relief or the resolution of issues concerning his tax liability.  He states: "Worsham is not seeking a determination of the amount of any federal taxes due for any year for him or for anyone else. He is not seeking the restraint of the assessment or collection of any taxes for him or any other person.   There are no sums in dispute or to be determined, or pending audits."  Dismiss Opp. at 5.  As Worsham sees it, the Treasury is "simply incorrect" in claiming that Worsham "is asking the Court to restrain the collection of tax he may owe" and to order "that [Worsham] is not even required to file a federal income tax return."  *Id.*  In connection with Count 4, Worsham argues

---

[8] Although the Declaratory Judgment Act itself does not contain an express waiver of sovereign immunity, 5 U.S.C. § 702, a provision of the Administrative Procedure Act, effectuates a broad waiver of the federal government's sovereign immunity in actions "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  Assuming, *arguendo*, that § 702 might waive the government's sovereign immunity with respect to the declaratory relief requested in this suit, the Declaratory Judgment Act's tax carve-out nonetheless precludes the availability of the declaratory relief Worsham seeks.

that granting the declaratory relief he seeks "would simply result in an order declaring what is already in fact the case—that the federal income tax is administered by the IRS as a direct non-apportioned tax." *Id.* at 10.  Because Worsham is not seeking to compel the government to take any action or refrain from acting in connection with the collection of taxes, he reasons that the Anti-Injunction Act is not implicated here.

In his quest to avoid the Charybdis-like pull of the Anti-Injunction Act, Worsham wrecks his claims against the unyielding Scylla of Article III's case-or-controversy requirement.   A "federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).  Put another way, a federal court is obliged "'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"  *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Missouri*, 361 U.S. 363, 367 (1960) (citation omitted); *see Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 242 (1952) (holding that federal "judicial power does not extend to abstract questions" and the dispute in a particular case "must not be nebulous or contingent but must have taken on fixed and final shape") (internal quotation marks and alterations omitted).  To the extent that Worsham simply seeks to have this Court issue a non-binding advisory opinion on the constitutionality of the income tax and the propriety of certain IRS forms, this Court lacks the power to do so.

Even if the Court possesses the power, it lacks the inclination.  As to Counts 3 and 4, Worsham has made it abundantly clear that he is only seeking declaratory relief.  As the

Supreme Court reaffirmed in *Wilton v. Seven Falls. Co.*, 515 U.S. 277, 286 (1995), district courts have the discretion to abstain from exercising jurisdiction in declaratory judgment actions. In other words, "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their discretion yields to considerations of practicality and wise judicial administration." *Id.* at 288. This is because the Declaratory Judgment Act, which is the source of the federal courts' authority to issue declaratory judgments, has been understood, "[s]ince its inception," to "confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* at 286 (citing *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942)).

Indeed, the Declaratory Judgment Act contains a "textual commitment to discretion": it provides that a court "'*may* declare the rights and other legal relations of any interested party seeking such declaration.'" *Wilton*, 515 U.S. at 286 (quoting 28 U.S.C. § 2201(a)) (emphasis in *Wilton*); *see also United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998). Thus, of import here, when a federal plaintiff seeks *only* discretionary declaratory relief, a district court is authorized to decline the plaintiff's invitation. *See Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 211 (4th Cir. 2006) ("[T]he *Brillhart/Wilton* standard does not apply when a declaratory judgment claim is joined with a nondeclaratory claim, such as a claim for damages or injunctive relief.").

To be sure, the Fourth Circuit has long maintained that "'a declaratory judgment action is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."'" *Penn-America Ins. Co. v. Coffey*,

368 F.3d 409, 412 (4th Cir. 2004) (quoting *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996), in turn quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.3d 321, 325 (4th Cir. 1937)) (alteration in *Coffey*).  But here, the arguments that Worsham raises as to Counts 3 and 4 are well-worn and oft-rejected by the federal courts; in the absence of a more particularized controversy, it would serve no purpose for this Court to add to the literature.

It is also worth observing that Worsham asserted the same arguments regarding the constitutionality of the income tax in a proceeding in the United States Tax Court regarding his failure to report taxable income in 2006.  The Tax Court rejected his arguments and was affirmed on appeal by the Fourth Circuit, in an unreported opinion issued after completion of the briefing of Worsham's PRA Motion and the Treasury's Motion to Dismiss.  *See Worsham v. Comm'r of Internal Revenue*, ___ F. App'x ___, 2013 WL 3215228 (4th Cir. June 27, 2013).  Notably, the Fourth Circuit found Worsham's constitutional arguments against the income tax "unpersuasive" and "meritless."  *See id.*

For the foregoing reasons, I will grant the Treasury's Motion to Dismiss Counts 3 and 4 for lack of subject matter jurisdiction.  Consequently, Worsham's PRA Motion will be denied, as moot.

## II.  Freedom of Information Act: Counts 1 and 2

Worsham advances two counts (Counts 1 and 2) under the FOIA.  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  To that end, the FOIA establishes a general obligation of public agencies to "make . . . records promptly available" to members of

the public upon request.   5 U.S.C. § 552(a)(3)(A).   However, there are several statutorily

enumerated exemptions from the general disclosure obligation, found in 5 U.S.C. § 552(b).   *See,*

*e.g.*, *Havemann v. Astrue*, Civ. No. ELH-___, 2012 WL 4378143, at *4 (D. Md. Sep. 24, 2012)

("an agency may withhold information where a record falls within one of FOIA's nine specific

statutory exemptions"), *aff'd*, ___ F. App'x ___, 2013 WL 3943144 (4th Cir. Aug. 1, 2013).

Nevertheless, "FOIA exemptions are to be narrowly construed," in favor of disclosure.   *FBI v.*

*Abramson*, 456 U.S. 615, 630 (1982).

   "The government has '[t]he burden of demonstrating that a requested document falls

under an exemption,' which it can satisfy 'by describing the withheld material with reasonable

specificity and explaining how it falls under one of the enumerated exemptions.'"   *Am. Mgmt.*

*Servs., LLC v. Dept. of the Army*, 703 F.3d 724, 729 (4th Cir. 2013) (internal citations omitted).

Although affidavits submitted by an agency are entitled to "'a presumption of good faith,'"

*Carney v. U.S. Dept. of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citation omitted), no deference

is owed to the agency's determination to withhold records.   *See* 5 U.S.C. § 552(a)(4)(B).

"Whether a document falls within a prescribed exemption" is "a question of law," which a court

decides "de novo."   *Am. Mgmt. Servs.*, 703 F.3d at 729.

   Worsham's FOIA counts relate to two separate requests for production of documents.

Count 1 relates to a request that Worsham submitted to the IRS on April 10, 2012, seeking

information regarding the preparation of a publication entitled "The Truth About Frivolous Tax

Arguments" ("The Truth"), which is available from the IRS's website.   *See* Amended Complaint

¶¶ 4-13. Worsham's request is focused on ascertaining the genesis of a section of The Truth that

purports to refute the constitutional argument, discussed *supra*, that he advances against the

- 17 -

income tax.  The section of The Truth at issue addresses the "Contention" that "The Sixteenth Amendment does not authorize a direct non-apportioned federal income tax on United States citizens."  *See id.* ¶ 4.   Worsham contends that this section of The Truth materially mischaracterizes governing Supreme Court precedent regarding the Sixteenth Amendment.

Count 2 relates to a request that Worsham submitted to the IRS on or about September 20, 2012, requesting a copy of "'any notice that the IRS asserts it has ever provided to [Worsham] about any backup witholding [sic] the IRS has initiated about [him].'"  *Id.* ¶ 16 (quoting request); *see generally id.*¶¶ 14-20.

The IRS did not respond substantively to either request until after Worsham filed suit. Nevertheless, although the FOIA establishes a presumptive twenty-day deadline for an agency to respond to a request, *see* 5 U.S.C. § 552(a)(6), "a lack of timeliness or compliance with FOIA deadlines does not preclude summary judgment for an agency, nor mandate summary judgment for the requester." *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 68 (D.D.C. 2003); *see also Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982) ("[H]owever fitful or delayed the release of information under the FOIA may be, once all requested records are surrendered, federal courts have no further statutory function to perform."); *Hainey v. U.S. Dept. of the Interior*, 925 F. Supp. 2d 34, 42 (D.D.C. 2013) (citing cases).   Rather, once an agency has responded to a request, "the only issue for [a] Court to consider . . . is whether the [agency's] response complies with its obligations under FOIA." *Hainey*, 925 F. Supp. 2d at 42. "'[W]hether the search was completed before or after the requestor files a lawsuit, the remedy available to the plaintiff is the same: access to the documents to which he is entitled under the law.'" *Richardson v. U.S. Dept. of Justice*, 730 F. Supp. 2d 225, 232 (D.D.C. 2010) (citation omitted).   If the court determines

that the agency has, "however belatedly, released all nonexempt material, [the court has] no further judicial function to perform under the FOIA." *Perry*, 684 F.2d at 125.  Therefore, the timing of the IRS's responses is of no moment.

The IRS responded to the request that is the subject of Count 2 by indicating that it has no responsive documents.   Although the IRS provided a copy of the notice of the backup withholding at issue that was sent to Worsham's financial institution, the Aberdeen Proving Ground Federal Credit Union ("APGFCU"), *see* ECF 42-2 at 10, it stated that, after a thorough search of its records, it could find no copy of any notice sent to Worsham.  *Id.* at 1-5.  Worsham does not dispute the sufficiency of the IRS's response as to the request that is the subject of Count 2.  *See* FOIA Cross-MSJ at 1.  Indeed, he "anticipated that there would be no responsive documents related to the IRS providing Worsham any prior notice of backup withholding, thus proving that the IRS instigated withholding on Worsham's bank accounts without providing any prior notice . . . ." *Id.*  Accordingly, there are no live FOIA issues with respect to Count 2.

As to Count 1, the IRS identified 215 pages of responsive material, and produced documents to Worsham on or about May 15, 2013.  Of the 215 pages of responsive material, the IRS withheld 104 pages in full and produced the remaining 111 pages subject to partial redaction (out of the 111 pages produced, 70 pages contain redactions).  Some of the partial redactions were made pursuant to FOIA Exemption 6, which authorizes the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Those redactions consist entirely of the direct-dial telephone numbers of particular IRS employees identified in the records.  Worsham does not challenge any of the redactions pursuant to Exemption 6.  *See* FOIA Cross-MSJ at 3.

The remaining redactions, including the 104 pages that were withheld in full, were made pursuant to FOIA Exemption 5, which authorizes the withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "To qualify" for withholding under Exemption 5, a document must "satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dept. of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Am. Mgmt. Servs.*, 703 F.3d at 732 ("To fall within Exemption 5, a document must (1) be inter- or intra-agency and (2) fall within a discovery privilege.").

"Exemption 5 is 'designed to protect the quality of administrative decisionmaking by ensuring that it is not done "in a fishbowl."'" *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 371 (4th Cir. 2009) (citations omitted). To that end, one of the evidentiary discovery privileges encompassed by Exemption 5 is the "deliberative process" privilege. *Klamath*, 532 U.S. at 8-9; *see also Rein*, 553 F.3d at 371. All of the Exemption 5 redactions at issue are based on the deliberative process privilege.[9] Ninety-six pages that were withheld in their entirety consist of drafts of The Truth. The remaining eight pages that were withheld in their entirety and all redactions to the redacted pages (other than the Exemption 6 redactions) consist of comments and discussion by IRS employees made during the drafting and revision of The Truth.

---

[9] Exemption 5 also incorporates the attorney-client privilege and the attorney work product doctrine. *See, e.g.*, *Hunton & Williams v. U.S. Dept. of Justice*, 590 F.3d 272, 276 (4th Cir. 2010). Although many if not all of the documents at issue were drafted by attorney employees of the IRS, the Treasury has not asserted attorney-client privilege or work product protection for the documents. Accordingly, I do not address those doctrines.

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  It rests on "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Klamath*, 532 U.S. at 8-9 (internal citation omitted).  Thus, the privilege "encourages free-ranging discussion of alternatives; prevents public confusion that might result from the premature release of such nonbinding deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions, but 'for matters they considered before making up their minds.'" *City of Va. Beach v. U.S. Dept. of Commerce*, 995 F.2d 1247, 1252-53 (4th Cir. 1993) (citation omitted).

"Documents withheld or redacted pursuant to the deliberative process privilege must be both 'predecisional' and 'deliberative.'" *Rein*, 553 F.3d at 372.  "Predecisional documents are 'prepared in order to assist an agency decisionmaker in arriving at his decision.'" *City of Va. Beach*, 995 F.2d at 1253 (citation omitted).  It is "difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached[.]" *Sears, Roebuck*, 421 U.S. at 151.  Therefore, "communications made after the decision and designed to explain it" are not protected by the privilege.  *Id.*; *accord Petroleum Info. Corp. v. U.S. Dept. of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made.") (Ginsburg, Ruth Bader, J.) (citation

omitted).   Nevertheless, "the line between pre-decisional documents and postdecisional documents may not always be a bright one."  *Id.* at 152 n.19.  And, an agency is not necessarily required "to identify a specific decision in connection with which a memorandum is prepared," because agencies "are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions[.]"  *Id.* at 151 n.18.

A document is "deliberative" if it "reflects the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes."  *City of Va. Beach*, 995 F.2d at 1253 (internal citation omitted); *accord Rein*, 553 F.3d at 372-73.  Deliberative documents may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *City of Va. Beach*, 995 F.2d at 1253 (internal quotation marks omitted); *accord Rein*, 553 F.3d at 373.

"Generally, draft documents are considered predecisional and are exempted from disclosure *if they are deliberative in nature*."  *King v. IRS*, 684 F.2d 517, 519 (7th Cir. 1982) (emphasis added). But, "[m]ere classification of a document as a 'draft document' does not end the inquiry; the government must also prove that the document is pre-decisional and related to a deliberative process."  *Techserve Alliance v. Napolitano*, 803 F. Supp. 2d 16, 27 (D.D.C. 2011). A "draft is only privileged if it contains discussions that reflect the policy-making process.  It is not privileged if it reflects the personal opinions of a writer with respect to how to explain an *existing* agency policy or decision."  *Nat'l Day Laborer Organizing Network v. U.S. Immigration & Customs Enforcement*, 811 F. Supp. 2d 713, 741 (S.D.N.Y 2011) (emphasis in original)

(footnote omitted); *accord Fox News Network, LLC v. U.S. Dept. of Treasury*, 911 F. Supp. 2d 261, 276 (S.D.N.Y. 2012); *see also Public Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010) (stating that, if "[a] document . . . does nothing more than explain an existing policy [it] cannot be considered deliberative"); *Mapother v. Dept. of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (stating that a "'salient characteristic' of information eligible for protection under [the] deliberative process privilege is its 'association with a significant *policy* decision'") (quoting *Petroleum Info. Corp.*, 976 F.2d at 1437) (emphasis in *Petroleum Info. Corp.*).

The district court explained in *National Day Laborer Organizing Network*, 811 F. Supp. 2d at 741 (footnote omitted):

> [T]he deliberative process privilege [is inapplicable to documents that] do not contain agency deliberations about what [the agency's] policies should be, but rather about what message should be delivered to the public about what [the agency's] policies are.  Such "messaging" is no more than an explanation of an existing policy, which is not protected by the deliberative process privilege. Deliberations about how to present an already decided policy to the public, or documents designed to explain that policy to—or obscure it from—the public, including in draft form, are at the heart of what should be released under FOIA. After all, what FOIA requesters are frequently seeking is evidence of discrepancies between what their government is saying versus what it is doing, or what it is saying in public versus what it is saying behind closed doors. This is the type of concern that FOIA seeks to vindicate, and discussions about proper "messaging" will often be quite revealing.

The fact that a document relates to past agency policy decisions and past agency events does not necessarily mean that drafts of that document do not qualify for the deliberative process privilege.  "Drafts of public relations documents . . . may properly be withheld if their release would reveal the status of internal agency deliberations on substantive policy matters." *Fox News Network*, 911 F. Supp. 2d at 277.

*Dudman Communications Corp. v. Dept. of the Air Force*, 815 F.2d 1565 (D.C. Cir. 1987), and *Russell v. Dept. of the Air Force*, 682 F.2d 1045 (D.C. Cir. 1982), are instructive. In those cases, the D.C. Circuit held that preliminary drafts of manuscripts presenting the histories of certain Air Force actions in the Vietnam War were subject to the deliberative process privilege. In *Russell*, for example, which involved a history of the Air Force's use of the herbicide Agent Orange, the court reasoned that the final historical manuscript "emerged from the [Office of Air Force History'] editorial review process [and] constitutes the Air Force's official statement concerning the history of herbicide use in the Vietnam conflict." *Id.* at 1048. The drafts were protected by the privilege because the "Air Force depends on this official statement [*i.e.*, the final document] to provide a basis for future military and public policy decisions," and "must stand by its history in the public forum, and, in light of the possibility of Agent Orange disability litigation brought by Vietnam veterans, perhaps in the judicial forum as well." *Id.*

In judicial review of a FOIA withholding decision, the "burden is on the agency" to justify its withholding. 5 U.S.C. § 552(a)(4)(B). To determine whether the agency has met its burden, the court "may examine the contents of [the] agency records in camera," *id.*, but in camera inspection is not necessary in every case. In some circumstances, an agency may make the necessary showing via a "*Vaughn* index." *Vaughn* indexes, which derive their name from the first appellate decision to endorse their use, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), are annotated lists of documents that an agency has withheld or redacted. A *Vaughn* index "must include sufficiently detailed information to enable a district court to rule whether the document falls within a FOIA exemption." *Rein*, *supra*, 553 F.3d at 357 n.6.

- 24 -

A *Vaughn* index is intended to provide a line of first defense for an agency, in recognition of "the potential damage that disclosure, even to the district court, might have on the deliberative process of an agency." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1249 (4th Cir. 1994) (citing *EPA v. Mink*, 410 U.S. 73 (1973)). An agency is entitled to the "the opportunity, by means of detailed affidavits or oral testimony, to establish to the satisfaction of the District Court that the documents sought fall clearly beyond the range of material that would be available to a private party in litigation with the agency." *Mink*, 410 U.S. at 93. Submission of a *Vaughn* index facilitates this review. But, the burden remains, "of course, on the agency resisting disclosure, and if it fails to meet its burden without *in camera* inspection, the District Court may order such inspection." *Id.* (internal citation omitted).

In this case, the Treasury has submitted a *Vaughn* index rather than submit to in camera review in the first instance. *See* ECF 42-1 at 20-28. The *Vaughn* index it has submitted adequately identifies by dates, authors, and recipients the documents that were subject to withholding or redaction. However, many of the annotations contain little detail explaining the Treasury's assertion of the deliberative process privilege, noting only that the particular document contains the author's proposed changes to The Truth or the author's reasons for suggesting certain changes.

The Treasury asserts that the documents it withheld or redacted were both predecisional and deliberative. They are predecisional, it reasons, because they were drafted in preparation of a final version of The Truth for posting on the IRS's website. And, they are deliberative, according to the Treasury, because Deborah Butler, the IRS's Associate Chief Counsel for Procedure and Administration, was the final decision maker with respect to which version of The

Truth to publish.  Because all of the drafts and commentary by junior officials were provided in service of Ms. Butler's ultimate decision as to publication, the Treasury contends that the documents are deliberative.

In essence, the Treasury contends that determination of what version of The Truth to publish was a policy decision.  According to the Treasury, the "policy reason for posting The Truth is to educate the public by 'helping taxpayers avoid wasting their time and money with frivolous arguments and incurring penalties.'  This purpose is clearly related to one of the IRS's missions, namely to help taxpayers comply with the law."  FOIA MSJ Reply at 4 (quoting IRS press release about publication of The Truth) (internal citations omitted).

Worsham counters that The Truth and its drafting process are entirely postdecisional and non-deliberative.  In his view, the policy decision at issue is the IRS's implementation of the income tax in its current form and its determination to defend the constitutionality of the income tax.  In Worsham's words, The Truth is not a policy, it is "propaganda."  FOIA Cross-MSJ at 7.  As he sees it, publication of The Truth is not a policy decision, because the document far postdates the IRS taxation policy and is merely a postdecisional compilation of court cases that purport to justify the IRS's policy.[10]

Whether a document constitutes a policy is sometimes a close question.  On the one hand, a document that describes an agency's historical actions may have a policymaking dimension, as *Dudman* and *Russell* reflect.  However, as the *National Day Laborer Organizing Network* and *Fox News Network* courts observed, an agency's determinations regarding "messaging" and

---

[10] Worsham also asserts that a "government misconduct exception" to the deliberative process privilege would apply.  Worsham has made no showing of government misconduct and therefore I need not further explore the contours of this exception.

"public relations" about its policy decisions—concerned solely with how to present to the public policy determinations that have already been made—are not subject to protection, unless the documents reflecting the messaging decisions would also necessarily disclose the agency's substantive policymaking process.

Unlike the historical manuscripts at issue in *Dudman* and *Russell*, The Truth has no obvious policy-setting role in its own right. Nor is there any indication that the IRS relies on The Truth "to provide a basis for future . . . public policy decisions." *Russell*, 682 F.2d at 1048. Rather, The Truth is akin to a "frequently asked questions" document. It presents to the public the IRS's established position, and the established position of the courts, as stated in judicial decisions compiled by the IRS, regarding various commonly recurring legal arguments against the validity of the income tax.

The IRS's argument that The Truth is a policy document because it furthers the IRS's policy goal of "educat[ing] the public by 'helping taxpayers avoid wasting their time and money with frivolous arguments and incurring penalties,'" FOIA MSJ Reply at 4 (internal citations omitted), would prove too much. If "education of the public" regarding an agency's established policy were recognized as a basis for the deliberative process privilege, any draft of *any* document prepared for public consumption, even an entirely postdecisional document, would be subject to the privilege. But, deliberations "about what message should be delivered to the public about what [an agency's] policies are" generally are postdecisional, and thus do not qualify for the privilege. *Nat'l Day Laborer Org. Net.*, 811 F. Supp. 2d at 741. "[D]ocuments discussing . . . already formulated policies—even if in draft format, and even if containing 'deliberative' discussions of how to portray those policies to the public—are not protected by the

deliberative process privilege and must be released, unless covered by another privilege or FOIA exemption." *Id.* at 743. Indeed, "[d]eliberations about how to present an already decided policy to the public, or documents designed to explain that policy to—or obscure it from—the public, including in draft form, are at the heart of what should be released under FOIA." *Id.* at 741.

Nevertheless, I cannot conclude that all of the redacted material generated in the drafting and revision of The Truth is unprotected by the deliberative process privilege because, without review, the possibility cannot be foreclosed that communications made in the course of drafting and revising The Truth could reveal agency policymaking processes. In the context of resolving these issues, the *Vaughn* index submitted by the Treasury is insufficiently detailed to determine, as a matter of law, whether communications made in the process of drafting and revising The Truth are protected by the deliberative process privilege. Therefore, I will direct the Treasury to submit the documents at issue for in camera inspection. Accordingly, I will hold the FOIA MSJ and the FOIA Cross-MSJ sub curia with respect to Count 1, pending my in camera review.[11]

However, I will deny, as moot, Worsham's FOIA Production Motion, given that an agency decision as to production, withholding, and/or redaction has been issued as to all of the documents in controversy. Moreover, I note that, in connection with Count 2 of Worsham's complaint, neither party addressed the non-FOIA-based relief Worsham seeks: specifically, a declaration that the IRS's backup withholding without notice to Worsham violated his due

---

[11] I do not criticize the propriety of the *Vaughn* index submitted by the government. A *Vaughn* index is intended as a permissible substitute for in camera inspection in cases where it can be established that "the documents sought fall clearly beyond the range of material that would be available to a private party in litigation with the agency." *Mink, supra*, 410 U.S. at 93. In other words, a *Vaughn* index can be dispositive in clear-cut cases, but even a properly prepared *Vaughn* index may not be an adequate substitute for in camera review when close issues are generated.

process rights, and an order directing the IRS to refund to Worsham the funds withheld pursuant to the backup withholding without notice.

It appears certain that such relief is foreclosed by the Anti-Injunction Act and the tax carve-out from the Declaratory Judgment Act, for the same reasons that Counts 3 and 4 of Worsham's complaint are foreclosed.  In any event, even if such relief is not jurisdictionally foreclosed, I exercise my discretion to decline to grant declaratory relief as to Worsham's due process claim requested in Count 2.  Because the FOIA issues in Count 2 are no longer in controversy, the Treasury is entitled to judgment in its favor with respect to the FOIA issues in Count 2.  As to the non-FOIA issues in Count 2, I will dismiss Count 2 for lack of subject matter jurisdiction.

### III.  Petition to Quash

The two summonses that Worsham seeks to quash were directed to APGFCU, *see* ECF 28-1, and M&T Bank, *see* ECF 28-2.  Each summons demanded from the financial institution in question all records in the institution's possession with respect to Worsham for the calendar years 2005, 2007, 2008, 2009, and 2010.  The date designated for production under each summons was January 22, 2013, and both summonses recited that the demanded production was "for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning [Worsham]" for the time periods designated.

The summonses were issued pursuant to 26 U.S.C. § 7602, which authorizes the IRS to issues summonses to third parties for documentary production "[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any

transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability," *id.* § 7602(a), and for "the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws." *Id.* § 7602(b). Moreover, the statute specifically prohibits the issuance of a summons "if a Justice Department referral is in effect" with respect to the person about whom records are sought. *Id.* § 7602(d). The phrase "Justice Department referral" encompasses two scenarios: (1) where the Treasury "has recommended to the Attorney General a grand jury investigation of, or the criminal prosecution of, [the] person [at issue] for any offense connected with the administration or enforcement of the internal revenue laws"; or (2) where the Justice Department has, in the course of its own investigation, requested disclosure by the Treasury of a "tax return or tax return information" regarding the person at issue. *Id.* § 7602(d)(2)(A)(i)-(ii).

The prohibition in § 7602(d) represents the legislative "codifi[cation of] the essence" of the Supreme Court's holding in *United States v. LaSalle Nat'l Bank*, 437 U.S. 298 (1978), to the effect that "the IRS may not issue a summons once it has recommended prosecution to the Justice Department . . . ." *United States v. Stuart*, 489 U.S. 353, 362-63 (1989) (citing *LaSalle* and discussing post-*LaSalle* enactment of provision now codified as § 7602(d), then codified as § 7602(c)). The rationale of this rule is that the IRS should not be permitted "to become an information-gathering agency for other departments, including the Department of Justice," *LaSalle*, 437 U.S. at 317, thereby effectively "broaden[ing] the Justice Department's right of criminal litigation discovery or . . . infring[ing] on the role of the grand jury as a principal tool of criminal accusation." *Id.* at 312; *accord Stuart*, 489 U.S. at 363. *LaSalle* and the post-*LaSalle* amendments to § 7602 are discussed in more detail, *infra*.

In *Alphin v. United States*, 809 F.2d 236 (4th Cir.), *cert. denied*, 480 U.S. 935 (1987), the Fourth Circuit observed that, pursuant to the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1965), the IRS's exercise of its summons power "is limited to the purposes established in § 7602," and "may not be used for improper purposes, 'such as to harass the taxpayer or to put pressure on him to settle a collateral dispute.'" *Alphin*, 809 F.2d at 237-38 (quoting *Powell*, 379 U.S. at 58). In a proceeding to quash an IRS summons under § 7609, the burden is on the government to "show that its summons authority is being used in good faith pursuit of [the statutory] purposes." *Alphin*, 809 F.2d at 238.

The government meets this burden initially by establishing a "prima facie case," consisting of four elements articulated by the Supreme Court in *Powell*: "1) the investigation is being conducted for a legitimate purpose; 2) the inquiry is relevant to that purpose; 3) the information sought is not already in the possession of the IRS; and 4) the administrative steps required by the Code have been followed." *Id.* (citing *Powell*, 379 U.S. at 57-58). "The government's burden is fairly slight" and can be satisfied "by an affidavit of an agent involved in the investigation averring the *Powell* good faith elements." *Alphin*, 809 F.2d at 238. "Once the government has made its prima facie case, the burden shifts to the party challenging the summons to show that enforcement would be an abuse of the court's process." *Id.* This burden is "heavy," because it requires the challenger to prove a negative: the challenger must "disprov[e] the actual existence of a valid civil tax determination or collection purpose." *Id.* (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978)).

The district court ordinarily "'should dispose of the proceeding on the papers before it . . . without an evidentiary hearing'" and without "allow[ing] discovery," unless the "the party

challenging the summons . . . allege[s] specific facts in its responsive pleadings, supported by affidavits, from which the court can infer a possibility of some wrongful conduct by the IRS." *Alphin*, 809 F.2d at 238 (citation omitted). "'Mere allegations of bad faith will not suffice'" to make the required "preliminary demonstration of abuse." *Id.* (citation omitted).

To establish its prima facie case in this proceeding, the Treasury has submitted an affidavit of Howard S. Jones, the IRS agent who issued the summonses to APGFCU and M&T Bank. *See* Affidavit of Howard S. Jones ("Jones Aff.") (ECF 32-1). Agent Jones averred that he was "conducting an investigation into the federal tax liability of Michael C. Worsham for the years 2005, 2007, 2008, 2009, and 2010" and, as part of that investigation, was "attempting to determine the true and correct amounts of all income" received by Worsham during those years. Jones Aff. ¶ 2. Jones stated that he issued the summonses to AGPFCU and M&T Bank on December 19, 2012, via certified mail, and on the same date sent notice of the summonses to Worsham, also by certified mail. *Id.* ¶¶ 4-7. He attached as exhibits to his affidavit copies of the certified mail return receipts as to the mailings to the financial institutions and Worsham.

Agent Jones specifically asserted that the IRS "is not already in the possession of the documents, books, papers, records or other data as described in the summonses." *Id.* ¶ 9. He also averred that, as of the date of his affidavit, the IRS had not "made a referral to the Department of Justice within the meaning of 26 U.S.C. § 7602(d) with respect to Michael C. Worsham for income tax liabilities for the 2005, 2007, 2008, 2009, and 2010 tax years," nor had the Justice Department "made any request [to the Treasury] for the disclosure of any return or return information . . . relating to Michael C. Worsham." *Id.* ¶ 11.

In opposition to the Treasury's prima facie case, Worsham presents five arguments. First, he argues that Agent Jones's affidavit is incorrect in stating that the IRS does not possess the documents subject to the summons, because the IRS already obtained Worsham's M&T Bank records for 2005 and the first three months of 2007 during a previous proceeding in the United States Tax Court. Second, he contends that the summonses are invalid because they do not comply with 12 U.S.C. §§ 3403 & 3405, provisions of the Right to Financial Privacy Act of 1978, codified as amended at 12 U.S.C. §§ 3401 *et seq.* Third, Worsham argues that, because the summonses recite that the production of documents is demanded for the "purpose of inquiring into an offense connected with the administration or enforcement of the internal revenue laws concerning [Worsham]," the summonses were issued for the improper purpose of undertaking a criminal investigation. Fourth, Worsham asserts the Fifth Amendment right against compelled self-incrimination as a basis to quash the summonses. Finally, he contends that the timing of the issuance of the summonses, during the pendency of this case and shortly before the week of Christmas 2012, is an indication that the summonses were issued for the purpose of harassing or retaliating against Worsham for the filing of this suit.

As to Worsham's first argument, the Treasury concedes that it is already in possession of Worsham's M&T Bank records for 2005 and the first three months of 2007. And, it further volunteers that it is has discovered that it is also in possession of Worsham's APGFCU records for the first three months of 2007. *See* Quash Reply at 2. According to the Treasury, Agent Jones was unaware when he issued the summonses that the IRS had already obtained those 2005 and 2007 records. Therefore, the Treasury states that it will no longer seek the records already in its possession and thus suggests that, with respect to those records, the Petition to Quash is moot.

However, because the IRS's possession of the records sought negates an element of the government's prima facie case with respect to those records, and the summonses at issue on their face demand production of the records, I will quash the summons to M&T Bank with respect to records for 2005 and the first three months of 2007, and will quash the summons to APGFCU with respect to records for the first three months of 2007.

None of Worsham's other arguments has merit.  The provisions of the Right to Financial Privacy Act upon which he relies generally prohibit financial institutions from providing "any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions" of the Act, 12 U.S.C. § 3403(a), and impose certain requirements with respect to governmental use of administrative summonses to obtain financial records.  *See id.* § 3405.  However, § 3413(c) states: "Nothing in [the Right to Financial Privacy Act] prohibits the disclosure of financial records in accordance with procedures authorized by Title 26."  This explicit exemption for procedures authorized by the tax code (*i.e.*, 26 U.S.C.) includes the procedures under 26 U.S.C. § 7602, pursuant to which the summonses for Worsham's records were issued.  Therefore, the IRS was not required to comply with the Right to Financial Privacy Act in issuing the summonses.

Worsham's argument that the summonses were issued for the improper purpose of criminal investigation also fails.  To be sure, the Supreme Court held in *LaSalle*, *supra*, 437 U.S. 298, that it was an improper use of the administrative summons power for the IRS to issue a summons after it has already made a referral for criminal prosecution to the Justice Department, or to "delay in submitting a recommendation to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather

additional evidence for the prosecution." *Id.* at 317.  However, as the Treasury points out, Congress responded to *LaSalle* in 1982 by enacting the Tax Equity and Fiscal Responsibility Act ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324, which, in relevant part, codified 26 U.S.C. § 7602(b).  Section 7602(b), enacted by the TEFRA, provides explicitly that the IRS may issue a summons for "the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws."  The language in the summonses that Worsham contends demonstrates an illegitimate purpose is drawn essentially verbatim from that statutory authorization.

As the legislative history of the TEFRA makes clear, by enacting § 7602(b), Congress sought to limit the scope of inquiry into agency intent that *LaSalle* had prescribed.  The Senate Finance Committee Report on the TEFRA, S. Rep. No. 97-494, Vol. I, at 285-86, clearly explained the reason for the enactment of § 7602(b):

> Under *LaSalle*, the Secretary may not use an administrative summons once the Internal Revenue Service has referred a case to the Department of Justice for prosecution or has made an institutional commitment to refer a case to the Department for criminal prosecution.  This rule has spawned protracted litigation without any meaningful results for the taxpayer.  Yet, summons enforcement proceedings should be summary in nature and discovery should be limited.  *Therefore, the restrictions under present law on the use of administrative summonses once the Internal Revenue Service has made an institutional decision to abandon pursuit of a civil tax determination or collection, or has made an institutional commitment to refer a case to the Justice Department, have encouraged wasteful litigation.*  (Emphasis added.)

> Many tax investigations by the Internal Revenue Service have both civil and criminal aspects.  The committee believes that a clear definition of when the power to issue an administrative summons exists and when it does not exist in cases with a criminal aspect will simplify administration of the laws without prejudicing the rights of taxpayers.  *To permit the drawing of a clear distinction, it was necessary to expand the purposes for which an administrative summons may be issued by the Internal Revenue Service.*  (Emphasis added.)

*   *   *

> Under the bill, the Secretary may not issue any summons or commence any action to enforce a summons if a Justice Department referral is in effect with respect to the person whose tax liability is in issue. . . .
>
> *   *   *
>
> The restrictions on the use of administrative summonses stated in *LaSalle* arise from the provision of present law which limits the use of administrative summons to the determination and collection of taxes. *The bill expands this authority to include the right to issue a summons for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws.* (Emphasis added.)

This legislative history confirms what the statutory text plainly indicates: the IRS is expressly permitted by § 7602(b) to use an administrative summons to investigate any offense connected with the tax laws (so long as, pursuant to § 7602(d), a Justice Department referral is not in place).  Therefore, it is of no moment that the stated purpose of the summonses at issue was such an investigation.  Under § 7602 as amended by the TEFRA, "'[t]he IRS may issue a summons for a solely criminal purpose as long as the case has not been referred to the Department of Justice for criminal prosecution or grand jury investigation.'"  *United States v. Norwood*, 420 F.3d 888, 894 (8th Cir. 2005) (citation omitted).  If, as here, the challenger to an IRS summons does not dispute sworn declarations submitted by the government "that a referral to the Department of Justice has not occurred," the summons "complies with the amended version of § 7602 regardless [of] whether its purpose is solely criminal."  *Id.*; *see also Scotty's Contracting & Stone, Inc. v. United States*, 326 F.3d 785, 789 (6th Cir. 2003) ("[T]he IRS may validly issue summonses for the purpose of investigating criminal offenses, even if that is the sole purpose, so long as there is no Justice Department referral in effect.").[12]

---

[12] Worsham quotes the Supreme Court's post-TEFRA decision in *Stuart*, *supra*, 489 U.S. 353, which described *LaSalle* as holding that "the IRS may not issue a summons once it has recommended prosecution to the Justice Department, *nor may it circumvent this requirement by delaying such a recommendation in order to gather additional information*," *id.* at 362-63

Of course, this is not to say that TEFRA "created a bright-line rule precluding a determination of improper motive in the absence of a Justice Department referral." *Nero Trading, LLC v. U.S. Dept. of Treasury, IRS*, 570 F.3d 1244, 1250 n.4 (11th Cir. 2009) (finding quoted "notion . . . unpersuasive").  Rather, "improper motive or purpose is not so narrowly circumscribed" as to "only mean the issuance of a summons in order to conduct a criminal investigation." *Id.*  In other words, post-TEFRA, a challenger may still seek to establish that a summons was issued for an improper purpose; § 7602(b) simply indicates that, in the absence of a Justice Department referral, a sole purpose of criminal investigation is no longer an improper purpose for issuance of a summons.

---

(emphasis added), and stated that the TEFRA "codified the essence of [*LaSalle*'s] holding." *Id.* at 363.  This passage from *Stuart* does not clearly state the proposition for which Worsham suggests it stands: that, even post-TEFRA, the IRS may not use a § 7602 summons to investigate potential criminal offenses.

Even if the quoted passage from *Stuart* could be taken to imply that proposition (which is inconsistent with the plain text of the statute and the legislative history, as described above), the passage was *dictum*.  *Stuart* concerned whether enforcement of a summons issued under an international treaty obligation, pursuant to a request from foreign taxing authorities, required an inquiry into whether the foreign "tax investigation has . . . reached a stage analogous to a domestic tax investigation's referral to the Justice Department for criminal prosecution." *Id.* at 356.  The Court held that § 7602 did not apply because it "speaks only to investigations into possible violations of United States revenue laws," *id.* at 362, and "Congress did not intend to make the enforcement of a treaty summons contingent upon the foreign tax investigation's not having reached a stage analogous to a Justice Department referral." *Id.* at 363.

Moreover, subsequent federal appellate decisions have not read *Stuart* to stand for the plainly incorrect proposition for which Worsham cites it.  *See, e.g.*, *Scotty's Contracting*, 326 F.3d at 789 (stating that "it is apparent that the [*Stuart*] Court was referring to the portion of the holding in *LaSalle National Bank* that the IRS may not issue a summons once it has recommended prosecution to the Justice Department" when referring to *LaSalle*'s "essence" as codified in § 7602, and that "the holding in *Stuart* is not contrary to, and is in fact consistent with, our conclusion that the IRS may validly issue summonses for the purpose of investigating criminal offenses, even if that is the sole purpose, so long as there is no Justice Department referral in effect").

Worsham's invocation of the Fifth Amendment is also inapt.  His position is squarely foreclosed by *Couch v. United States*, 409 U.S. 322 (1973).  In *Couch*, the government sought enforcement of a summons issued pursuant to § 7602 to a taxpayer's accountant for production of financial records related to the taxpayer.  *See id.* at 323.  The Court held that the taxpayer could not "invoke her Fifth Amendment privilege against compulsory self-incrimination to prevent the production of her business and tax records in the possession of her accountant."  *Id.* The Court "reiterate[d] that the Fifth Amendment privilege is a personal privilege: it adheres basically to the person, not to information that may incriminate him."  *Id.* at 328.  The crucial "ingredient of personal compulsion against an accused [was] lacking. The summons and the order of the District Court enforcing it are directed against the accountant.  He, not the taxpayer, is the only one compelled to do anything."  *Id.* at 329 (footnote omitted).  Therefore, the taxpayer's Fifth Amendment right against self-incrimination was not implicated.  *Id.  Couch* is dispositive of Worsham's Fifth Amendment argument.[13]

Finally, I reject Worsham's argument that the timing of the summonses creates an inference of a motive of retaliation or harassment sufficient to defeat the Treasury's prima facie case and entitle him to discovery or an evidentiary hearing.  Sheer speculation regarding the timing of the issuance of a summons cannot meet Worsham's "heavy" burden, in the face of the

---

[13] Worsham appears to cite the Fifth Amendment only in connection with the right against self-incrimination that it establishes.  The Fourth Circuit has upheld § 7602 against a post-TEFRA constitutional challenge based on the right to indictment by grand jury, which is also contained in the Fifth Amendment.  *See United States v. Morgan*, 761 F.2d 1009, 1012 (4th Cir. 1985) (rejecting claim that, "by vesting revenue agents with the power to summons, free of restraint, any material in connection with the investigation of a criminal offense under the tax laws," in § 7602(b), "Congress has impermissibly constituted these employees of the executive branch as 'one person grand juries' in violation of the fifth amendment guarantee of prosecution upon indictment by grand jury").

Treasury's prima facie case, to "disprov[e] the actual existence of a valid civil tax determination or collection purpose," by "allege[ing] specific facts . . . , supported by affidavits, from which the court can infer a possibility of some wrongful conduct by the IRS." *Alphin*, *supra*, 809 F.2d at 238 (citation omitted).  In sum, Worsham's "'[m]ere allegations of bad faith will not suffice'" to prevent enforcement of the summonses. *Id.* (citation omitted).

Accordingly, I will quash the summons to M&T Bank in part, only with respect to records pertaining to 2005 and January, February, and March of 2007.  And, I will quash the summons to APGFCU in part, only with respect to records pertaining to January, February, and March of 2007.  Otherwise, I will order that the summonses be enforced and that the records demanded by the summonses be produced on a date certain to be specified by the IRS, which shall be within thirty days after this Opinion is issued but not less than seven days after the IRS provides notice of my ruling to the financial institutions subject to the summonses.

## IV.  Conclusion

For the foregoing reasons, I will grant the Treasury's Motion to Dismiss Counts 3 and 4 for lack of subject matter jurisdiction and will deny, as moot, Worsham's PRA Motion.  I will also deny, as moot, Worsham's FOIA Production Motion.  I will grant the FOIA MSJ in part and hold it sub curia in part, and deny the FOIA Cross-MSJ in part and hold it sub curia in part.  In particular, summary judgment is granted to the Treasury with respect to the FOIA claim in Count 2; Count 2 is dismissed for lack of subject matter jurisdiction to the extent that it asserts non-FOIA claims.  With respect to Count 1, I will hold the FOIA MSJ and FOIA Cross-MSJ sub curia, pending in camera review of the documents responsive to Worsham's FOIA request.  In addition, the Petition to Quash and the Quash Motion will be granted in part and denied in part,

and the administrative summonses at issue will be quashed in part and otherwise enforced.   An

Order implementing my rulings follows.


Date:   September 17, 2013                     _____/s/_____
                                                                Ellen Lipton Hollander
                                                                United States District Judge